Oampkeix, Chief Justice,
delivered the opinion of the court:
The plaintiff, Baltimore & Ohio Railroad Company, sues for a large sum alleged to have been laid out and expended in the construction of barracks for United States troops at Locust Point, Md.
The claim was first presented to the War Department Claims Board under what is known as the Dent Act. 40 *147 Stat. 1272, in the names of two parties, “ as their interests may appear,” but it comes to this court upon the petition of the railroad company alone. The board held that no contract, express or implied, was shown by the proof; this ruling was sustained by the appeal section of the board, and upon appeal taken to the Secretary of War the decision was affirmed. The only evidence adduced is that which was before the board, it having been brought into this record by stipulation of the parties.
The Dent Act empowered the Secretary of War to “ adjust, p;ijr. or discharge any agreement, express or implied, * * * entered into in good faith, * * * by any officer or agent, acting under his authority, direction, or instruction, or that of the President, with any person * * * for equipment or supplies or for service or for facilities, or other purposes connected with the prosecution of the' Avar when such agreement has been performed, in whole or in part, or expenditures have been made * * * ■ upon faith of the same by any such person * * * , and such agreement has not been executed in the manner prescribed by law.” The act contains several provisos not material here. By its terms it deals with agreements, express or implied, which so far as affects the Government shall have been entered into by a duly authorized officer or agent, and referring to agreements, express or implied, “ entered into in good faith,” between authorized persons, there should appear the essential element of “ a meeting of the minds.” Lord & Hewlett case, 217 U. S. 340 (43 C. Cls. 282). It is, of course, necessary that the claim itself be established by proof. The plaintiff does not claim under an express contract, but alleged that an implied agremeent arose out of certain negotiations in December, 1917, between its own agent, Mr. Moore, and Col. Kimball, who is alleged to haAre been “ an officer or agent acting under the authority, direction, or instruction of the Secretary of War” for the conversion of a transfer shed belonging to plaintiff into barracks and equipping the same for the accommodation of troops of the United States, and the building of an additional structure for the accommodation of officers. The amount claimed is $27,117.25.
*148 The railroad company had leased a pier to the Government at Locust Point for $150,000 per annum, and owned a number of piers there in addition, some six or eight. Vast stores were assembled in and about these piers. On the night of October 30, 1917, a fire, supposed to have been of incendiary origin, destroyed one of the. company’s piers and greatly damaged another. Lieut. Col. Kimball, Quartermaster Corps, in charge of expeditionary depot at Baltimore, communicated the fact the next morning to the War Department and requested that troops be dispatched immediately to guard the Government’s property at Locust Point. He told the acting president of the company of this request, and learned from him that Mr. Willard, president of the company, who was head of the Committee of National Defense, had made a similar request of the Secretary of War. Mr. Thompson, in that ■ conversation, offered the use of a train in the yards at Locust Point which he said was suitable for housing the troops. Two companies of troops from Camp Howard were ordered to Locust Point. They were part of the Maryland National Guard that had been mustered into service and were composed largely, if not entirely, of men whose local residences were at Baltimore. The order directed that tentage be carried with the troops, and it was carried. When the companies arrived at Locust Point, one on November 3 and the other November 4, they were quartered in the cars of the wrecking train of which Mr. Thompson had spoken to Col. Kimball, and remained there until November 9, when the train was moved away and the troops went into the tents. These troops were intended to guard property at Locust Point as well as at Canton across the river, and they protected the property of the Government and the railroad company as well. The weather was very cold and severe during the winter of 1917. Some of the soldiers became sick, their relatives and friends complained repeatedly to officials of the company of the hardships the troops had to undergo in tents, and the want of accommodations. The troops had been in tents several weeks before the alleged negotiations between Mr. Moore and Col. Kimball, and it was during the period of the com *149 plaints above mentioned that the agreement is alleged to have been made. Mr. Moore suggested that a transfer shed belonging to the company could be converted into barracks. Col. Kimball approved the suggestion, but Mr. Moore was not authorized by the company to make the necessary alterations, nor was Col. Kimball authorized to incur the expense on the part of the Government. Mr. Moore took up the matter with his superiors, and they issued the necessary orders to convert the shed into living quarters and it was done. The shed was on the company’s land and its property. At no time was there a statement or suggestion that the expense of the structure was to be charged against the Government. What the cost would be was not submitted to Col. Kimball. He positively denies that he incurred or authorized the expense. He was not authorized, instructed, or directed by the Secretary of War to construct temporary barracks. The War Department was not communicated with on the subject. The statutes have regulated the expenditures for permanent barracks and buildings. See Rev. Stat., sec. 1136; act February 27, 1877, 19 Stat. 242; act February 27, 1893, 27 Stat. 484; act June 25, 1910, 36 Stat. 721. The Army appropriation act of May 12, 1917, 40 Stat. 74, contains a provision that “ hereafter no expenditure exceeding $5,000 shall be made upon any building or military post or grounds, about the same, without the approval of the Secretary of War, upon detailed estimates, submitted to him.” And if it may be said that these statutes do not in terms affect a structure such as that in question here, they at least indicate the policy that authority for expenditures shall be vested in a responsible head, who, generally speaking, is the Secretary of War. Assuming, however, there may be cases of exigency when an officer, to properly care for the troops under his command, may incur unusual, or at the time unauthorized expenses, that can not be the case where there is plenty of time before incurring the expense to ask for and to receive the necessary authority. At all times of the day communication between Baltimore and Washington was open; the troops remained in tents from November 9 to December 22; the president of the railroad company *150 was at the head of one of the most important war boards, and could readily have conferred with the War Department.
In these circumstances there was no reason why authoiity to incur the unusual expenditure should not have been sought at Washington; there was no present exigency justifying the building of barracks without fix•st definitely ascertaining the question of liability or seeking instructions with regard to it. The limited authority of an officer is a. matter that all persons dealing with him must take notice of, and there is nothing in the occui'rences that took place in this case that relieved the plaintiff from the duty to act advisedly in making outlays if it expected the Government to make reimbursement therefor. The evidence falls short of showing an agreement that would bind the Government to pay for altering or improving and adding to a structure on the company’s land that remained the company’s property after the alterations were made, and yet remains its property, even though it was used for a period to house United States troops. The duties of these troops involved in part the guarding of the company’s valuable properties.
The foregoing considerations are sufficient to dispose of the case, but there is an implication in plaintiff’s brief that tends to an erroneous conclusion on the question of proof. The implication is that because the Government does not “ disapprove ” the claim the plaintiff is entitled to judgment. It would seem from the record before the Claims Board that the matter of proof as to the amount or items of the claim itself, was passed over pending a determination of legal liability. The general traverse puts in issue all material elements in a plaintiff’s case in this court, and such a practice as that suggested before the board does not obtain here.
The petition should be dismissed, and it is so ordered.
Graham, Judge; Hat, Judge; Dowhey, Judge; and Booth, Judge, concur.